IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs December 2, 2019

## IN RE MAHALEY P. ET AL.

**Appeal from the Juvenile Court for Claiborne County**
**No. 2016-JV-1884     Robert M. Estep, Judge**

_____

### No. E2019-00770-COA-R3-PT

_____

This is the second appeal concerning the petition filed by the Tennessee Department of Children's Services ("DCS") in the Claiborne County Juvenile Court ("Juvenile Court") to terminate the parental rights of Ed P. ("Father") to the children, Mahaley P. and Morgan P. ("the Children"). During the first appeal as to Father, this Court reversed the statutory ground of substantial noncompliance with the permanency plan and remanded for the Juvenile Court to make additional findings of fact and conclusions of law related to the two remaining grounds and as relevant to the best interest analysis. *See In re Mickeal Z.*, No. E2018-01069-COA-R3-PT, 2019 WL 337038 (Tenn. Ct. App. Jan. 25, 2019). On April 4, 2019, the Juvenile Court entered an order making additional findings of fact and conclusions of law. Father appeals the April 4, 2019 order of the Juvenile Court terminating his parental rights to the Children upon its determination that DCS had proven by clear and convincing evidence the statutory grounds of persistent conditions and failure to manifest an ability and willingness to assume custody of the Children and that the termination of Father's parental rights was in the Children's best interest. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and KENNY W. ARMSTRONG, J., joined.

Dennis M. Bailey, Jr., Jacksboro, Tennessee, for the appellant, Ed P.

Herbert H. Slatery, III, Attorney General and Reporter, and Amber L. Seymour, Assistant Attorney General, for the appellee, the Tennessee Department of Children's Services.

## OPINION

## Background

In October 2016, the Juvenile Court entered an order placing the Children in the custody of DCS. DCS filed a petition for termination of the parents' rights in June 2017, which was granted by the Juvenile Court. The parents appealed to this Court. The previous appeal involved both Father and the Children's biological mother, Alesha Z. ("Mother"). The Children's half-sibling, Mickeal Z., also was involved in the previous appeal. Mickeal Z. is not involved in this appeal because Father is not his biological father. During the previous appeal, this Court summarized this case as follows:

> The Tennessee Department of Children's Services ("the Department") became involved with the parents and children in October 2016 after Mother was found with the children on the side of the road in Claiborne County. According to a later-filed "Petition for Temporary Legal Custody," the allegations of which were stipulated to by the parents, the Department's involvement itself stemmed from allegations that there was a drug-exposed child. In pertinent part, the Department's petition for custody outlined the following:
>
> > 2. This matter came to the Department's attention upon a referral for Drug Exposed Child. CM Gilliam made contact with the mother, Alesha, who stated that she had broken down after picking up her children from school in Ed's truck. The family has been living part of the time in Clairfield, TN and the rest of the time in Middlesboro, KY. Alesha stated that she did not have anyone to help her and so she reached out to the police. The truck was impounded and Alesha and the kids were brought to the Justice Center. There was no insurance on the truck and Alesha did not have her driver's license with her. Alesha did not have a booster seat in the truck for Mahaley. Alesha and the children were in the broken down vehicle for approximately 6 hours.
> >
> > 3. Alesha stated that she had "messed up" and done meth. Alesha stated that she had also taken a Hydro 7.5 earlier that day that she had found from an old prescription. Alesha consented to a [urine drug screen] and failed for methamphetamine, amphetamine, and THC. Alesha stated that she did not have anyone to pick her up and help her and that she and her fiancé Ed had split up because he had kicked

- 2 -

her in the face. Alesha reported that Ed had kicked her in his sleep when she tried to wake him.

4. Alesha stated that her children had been staying with her father . . . at night in Middlesboro, KY by agreement but that she had kept the children with her since the weekend. Alesha stated that she had broken down in her car the night before and had not got the children home until 4:00 am.

5. Alesha stated that the home at . . . Brentwood Circle Middlesboro, KY was built in 1893, and that it did not have water or electricity. Alesha stated that she and Ed were trying to remodel the home.

6. Ed could not be reached and Alesha stated that he was out of minutes and could not text either. Alesha requested for her father . . . to go get Ed and bring him to the Justice Center. [Her father] refused and stated that he does not get along with Ed. Alesha named several family members in TN but none could be approved for an IPA.

7. The children appeared tired and dirty. The baby Morgan was coughing and fussy. The baby smelled like vomit and the officer reported that the baby had vomited earlier. Mahaley appeared dirty and her clothes were dirty. Mickeal appeared appropriate but was very upset that he was going to have to miss his field trip at school on Wednesday.

On October 13, 2016, the Claiborne County Juvenile Court entered a protective custody order, pursuant to which the Department was awarded temporary legal custody of the children. A preliminary hearing was set for October 19, 2016, and following that hearing, the juvenile court determined that probable cause had been established to show that the children were dependent and neglected. An "Adjudicatory Hearing Order" was entered the following month after both parents waived the scheduled adjudicatory hearing and stipulated to the allegations in the Department's petition for custody. Pursuant to this latest order, the juvenile court held that the children were "dependent and neglected within the meaning of the law" and that their removal was required pursuant to the Tennessee Code. Although the order provided that the Department would retain temporary custody of the children, it also stated that the parents would be allowed supervised visitation according to the rules and regulations of the Department.

During the course of the Department's involvement with the family, a number of permanency plans were created. The first permanency plan, dated October 26, 2016, had several requirements directed to ensuring that the children had stable housing and that the parents were drug-free. With respect to the parents' ability to provide safe and stable housing, for instance, the permanency plan directed the parents to give the Department documentation of valid housing, provide information regarding their address, and provide documentation of legal income. Regarding substance abuse concerns, the permanency plan required Mother to schedule and attend an alcohol and drug assessment and follow all recommendations. Moreover, both parents were required to pass random drug screens and pill counts.

In addition to the above, the permanency plan had several other discrete requirements. Included among these was the requirement that Father establish parentage of the children. Further, the parents were required to attend the children's medical appointments, as well as create a transportation plan and provide the Department with proof of insurance on any vehicle in which the children would be transported. Concerning the parents' responsibilities regarding visitation, the permanency plan provided in relevant part as follows:

> Parents will schedule visitation at least one week prior to the desired visitation with the department FSW or private provider (if utilized). Parents will cancel any visit at least 24 hours prior to the scheduled visitation. Parents will arrive at the visit at least 15 minutes prior to the scheduled visit. The visitation will be cancelled if the parents arrive 15 minutes (or more) late for the visit. Parents will provide their own transportation to and from scheduled visit. Parents will provide for all the needs of the child(ren) during the visit such as any needed snacks, drinks, and diapers. Parents will demonstrate appropriate parenting skills during visits. Parents will not be under the influence of drugs or alcohol before or during the scheduled visit.

The second permanency plan, dated April 11, 2017,[1] added additional requirements for the parents. Whereas Father was required to schedule a mental health assessment, both parents were required to begin

---

[1] This second permanency plan was ratified on May 17, 2017.

- 4 -

family counseling. Both parents were also required to take anger management classes and provide documentation to the Department that the classes were completed. Further, the parents were directed to maintain contact with the Department at least once a week.

Citing concerns that Mother's diabetes was impeding her ability to effectively care for the children, the second permanency plan also required Mother to "follow recommendations from her doctor to maintain her health." Moreover, in light of the fact that both parents had criminal trespassing charges and unpaid tickets, both parents were required to resolve all legal issues.

The third permanency plan, dated October 11, 2017, was generally consistent with the previous two plans. However, as the Department has highlighted, the third plan specifically noted that Mother was not following the recommendations of her alcohol and drug assessment, whereas it did acknowledge that both parents had provided copies of valid driver's licenses.

On June 12, 2017, the Department filed its "Petition to Terminate Parental Rights" in the Claiborne County Juvenile Court, requesting that Mother's parental rights be terminated as to Mickeal Z., Mahaley P., and Morgan P., and that Father's parental rights be terminated as to Morgan P. The petition was later amended to specify that the Department was also seeking to terminate Father's parental rights to Mahaley P. Multiple grounds for termination were alleged in the Department's petition. As to both parents, the following grounds were asserted: abandonment for failure to provide a suitable home, substantial noncompliance with permanency plan, persistent conditions, and failure to manifest an ability to parent. As to Father alone, the Department alleged that Father had engaged in conduct that exhibited a wanton disregard for the children's welfare. In addition to asserting the above grounds for termination, the Department averred that the termination of Mother's and Father's parental rights would be in the children's best interests.

On May 11, 2018, the juvenile court held a hearing on the Department's termination petition. The first witness to testify was Nicki Stone, a case manager with the Department. Ms. Stone testified that when the family was brought to the attention of the Department, Mother reported to her that "things had been rough for her and that she had really messed up, that she had used meth and that she had taken some sort of pain pill." According to Ms. Stone, Mother also reported that the home she and Father

were residing in at that time had no water or electricity. Regarding the children, Ms. Stone stated that the children appeared "very tired and dirty" when she first saw them. Although Ms. Stone stated that Father could not be reached the night that the children came into custody, she testified that, during her subsequent interaction with him, he was compliant with everything that she asked him to do.

Next to testify was Jessica Dillon, a family service worker with the Department. Ms. Dillon was involved in the case from the time the children came into custody until the end of January 2017. She testified that she met with the parents to create the initial permanency plan. Among her concerns was the parents' housing; according to Ms. Dillon, their previous housing was not livable "due to bedbugs and several different things going on in that home." Mother's drug issues were also among Ms. Dillon's biggest concerns with the family at the time the initial permanency plan was created. During a drug screen on December 9, 2016, Mother tested positive for amphetamine, methamphetamine, opiate, and Oxycodone. Ms. Dillon testified, however, that Father tested clean at that time.

After Mother failed to show up on time for a January 13, 2017 visit, Ms. Dillon tried to find her and eventually located her in a mall bathroom. Ms. Dillon testified that, although she tried to administer a drug screen to Mother on that date, Mother refused. A few days later, on January 17, 2017, Ms. Dillon made an unannounced visit to a residence the parents had obtained at a trailer park in Cumberland Gap. No one was present when she arrived, and Ms. Dillon observed that there was a large amount of debris around the home, that there were smashed windows, and that the home did not appear to be livable. According to Ms. Dillon, at a subsequent foster care review board meeting on January 19, 2017, Mother tested positive for amphetamine, methamphetamine, and THC.

Ms. Dillon testified that Mother showed up for about half of her visitations with the children. Although she testified that the visits went well overall, she also stated that on some visits she suspected that Mother was under the influence. Ms. Dillon stated that Father was present at all of his visitations from what she recalls and that he did not fail any drug screens while she had the case.

After Ms. Dillon testified, the court heard from Rhonda Combs, an employee with Youth Villages. Ms. Combs was assigned to work with the family beginning in December 2016 after a referral from the Department, and she carried this responsibility through April 2017. Ms. Combs testified

that her role was as a support to help the parents meet the conditions of the permanency plan and that she was available three days a week. However, her testimony revealed that there was a lack of consistency regarding the parents' usage of this resource:

> Three times a week is what our schedule was. There were times that we would have a high rate of no-shows, and then they would do great and meet consistently for the next three weeks. And then they might fall off the next week, and it'd be once a week, then twice a week. So it kind of went back and forth a little bit.

Regarding the parents' trailer in Cumberland Gap, Ms. Combs testified that it had weak flooring and that it did not initially have water or electricity. Although she stated that the parties had made some progress by the time her involvement ended, she testified that the progress made was "minimal" and that there were still electrical issues in that wiring was exposed and not behind drywall. Ms. Combs further stated that, although a kitchen sink was working when she left, the parties had to use public facilities or five-gallon buckets they kept in the trailer in order to use the restroom. Although Ms. Combs advised the parents about public housing, she testified that no documentation was ever provided to her to confirm a claim made by Mother that the family was on a waiting list.

According to Ms. Combs, although the parents had put up some drywall in the trailer "for a little bit," the progress was removed. As she explained it:

> The problem . . . was whenever there would be an argument or disagreement in the home, [Mother] told me that -- and I saw the damage but she told me she did, but she took a hammer and went all the way down every bit of that drywall and busted it back up.

Ms. Combs further testified that graffiti had sometimes appeared in the home, the product of Mother venting her frustration following a disagreement. We observe that pictures chronicling some of the graffiti was introduced as an exhibit at trial. One of the messages, written in large print across a wall, concludes in part with the following: "What are you f***** in the head! You[']ll Regret." Another picture of Mother's graffiti shows a message stating that, "I Bought it I Bought it I hung it sorry for your luck That's what you get for refusing to take me to Rehab F*** You."

Clearly evident and interspersed throughout the graffiti in this latter message are various holes in the wall. According to Ms. Combs, Mother never reported that Father had made any of these holes and actually self-professed that the destruction was her own doing.

Specifically regarding the relationship between the parents, Ms. Combs testified as follows:

> When I first started with the case . . . [Father] . . . was actually in the hospital at U.T. after his surgery. [Mother] was extremely concerned with his care and well-being, wanted to take care of him, make sure he got better. So, initially the relationship seemed healthy, and they were there for each other.
>
> As we went on, whether it was high frustration levels or whatever contributed to it, there were many times that [Mother] would talk at me and tell me that he'd left her on the side of the road, that they had gotten in a fight going down the road -- she never said physical, just a fight going down the road. And he'd left her on the side of the road multiple times, that he'd dropped her off in front of the emergency station down from their house once before.
>
> There were frequent instances that they would be arguing, and he would leave the home to try to -- my sense would be to try to calm down before he came back. And she would follow him, and the situation would escalate again.

Although Ms. Combs recommended couple's counseling on multiple occasions to the parents, she claims there was "never any follow-through on that."

Ms. Combs also testified at length about Mother's drug issues. She claimed that Mother reported using marijuana frequently and that she had observed marijuana paraphernalia upon one visit to the parents' home. Moreover, Ms. Combs stated that Mother had reported to stealing Father's pain medication at one point and that she had admitted to going on meth binges:

> She would tell me she would be clean, and she would be very proud of herself when she hadn't used anything for several

- 8 -

days at a time. And I was proud of her, too, when she wasn't using. And then she would tell me, you know, that I'm going to be upset with her, that I'm going to be disappointed with her because she had used. And it was typically a time when she would be out of communication for two or three days, wouldn't respond when I tried to get in touch with her, and then she'd get in touch with me and tell me that's what had happened.

According to Ms. Combs, Mother was recommended to have in-patient treatment, and Ms. Combs even accompanied Mother throughout the entire intake process at a rehabilitation center. However, Ms. Combs testified that, after she left Mother at the center, Mother checked herself out within hours.

Father began his trial testimony by confirming that, although he was the father for Mahaley P. and Morgan P., he was not the biological father of Mickeal Z. He also stated that his residence at the time of the children's removal was at "Brentwood Circle." At the time of trial, he claimed to be living in a trailer owned by Mother and located approximately 150 feet from Mother's own home.

Father admitted that he oftentimes gets frustrated with Mother, and when asked how certain parts of the previous home in Cumberland Gap had been destroyed, he stated as follows:

> [A:] We had an argument and I would leave, and she would write on the wall or knock a hole in the wall one way or another.
>
> [Q:] And you would come back to her?
>
> [A:] I would come back because she's the mother of my children. I love her, yes, I do. But I'm not going to sit there and be treated or talked to bad because I can't get out what I need to.

Father also confirmed that he had broken his cell phone following a recent argument with Mother, but despite the occurrence of conflicts such as these, he admitted that he had never engaged in family counseling with Mother. Although much of Father's testimony communicated the idea that

he and Mother were "not together as a couple,"[2] the two were still involved with one another at the time of trial, even if such involvement was not of a romantic nature. Aside from the fact that the two lived next door to one another, Father testified that because Mother did not have a driver's license he would sometimes drive her and serve as her transportation. For instance, he stated that he drove Mother to court on the date of trial.

During the course of his testimony, Father recalled two occasions on which he had dropped off Mother at the police station following an argument. In explaining this, he stated as follows:

> She'd gone off on me. I asked her to get out of my vehicle. She refused to get out of my vehicle. I'm not going to sit and be yelled at and stuff and me not able to talk and defend myself. So I stopped at the police station and had a police officer get her out of the car so I wouldn't have to physically remove her from my vehicle.

When asked how he would avoid Mother if he was to ever regain custody of his children, Father replied as follows: "If need be, I would find suitable -- other suitable housing to where DCS could come in and approve it before I ever moved. Whatever it takes to get my kids home and make sure they're safe with me I will do." He also stated later in his testimony that "if there is a Court Order that [Mother] is not [to] be around the kids, I would ask for a petition . . . stating from the Court that she is not to be around me or the kids." Father indicated that he would have no problem calling law enforcement to ensure compliance with any such order.

Mother testified following Father. She admitted to having a meth problem at the time the children came into custody and did not dispute that she had failed several drug screens. She also admitted to having put graffiti on the walls of the Cumberland Gap home and to having taken a hammer and "bust[ing] out a piece of drywall" there. When asked if she had ever had the in-patient treatment recommended by her drug assessment, Mother stated that she had not. She further admitted that, despite initially checking into one in-patient rehab, she had not stayed long. Mother claimed to be clean at trial and testified that she had been clean for some time, even

---

[2] This notion seems to be the primary one communicated by Father, although we do note that the following exchange is present in the transcript of Father's testimony: "[Q:] But you stayed together for a really long time, and you all are still together. [A:] Yes, we have tried to work things out. Yes, we have."

asserting that she had been clean during a period when she got a DUI. Moreover, even though a drug screen from November 2017 indicated that Mother tested positive for opiates, Mother testified that she believed this result was incorrect.

Although Mother acknowledged living next to Father, she stated that she did not have a key to his home. When asked what she would do if Father got custody back, Mother stated that she would move further away from Father; she also acknowledged that she was willing to follow any type of court orders. Additionally, Mother testified that Father had never approved of any drug use.

Rachel Raines, a foster care worker for the Department, testified after Mother. According to Ms. Raines, who had worked with the family since January 2017, she could not recall Mother ever passing a drug screen prior to the filing of the termination petition. Ms. Raines offered to take Mother to rehabilitation for treatment, and ultimately did so, as she described at trial:

> Well, first, I had to come and get to her home. We had to kind of convince her to ride with me. She was very agitated. We rode down, and she was upset. We talked about her drug addiction and how long it had been going on and the kids and how important this was to start on her recommendations.
>
> And we got to the rehabilitation. They explained how rehabilitation would go. Ms. Combs later on joined us. We stayed with her through the entire process of them going through her things. And when she decided she would stay and go to bed, they asked me to leave and I did so.

Despite Mother's initial entry into treatment, Ms. Raines stated that Mother ultimately only stayed "[t]welve hours or less." Ms. Raines testified that she had attempted to help Mother find some type of rehab at other times and provided Mother with contact information of other long-term facilities.

According to Ms. Raines, she had been concerned that Mother might harm herself on several occasions. Recounting one such incident, Ms. Raines testified as follows:

> There was one occasion she failed a drug screen. She felt that she didn't fail. I called Mobile Crisis, because she said she

- 11 -

was going to get a gun and . . . kill herself. Mobile Crisis told me if I was that concerned, I needed to call the police, but she was very upset and, like, walking away from me. This is in the middle of the mall. I followed her outside, and she just kept walking away from me.

In addition to specifically addressing Mother's substance abuse issues and past concerns that Mother might self-harm, Ms. Raines also generally testified as to the parties' compliance with the various requirements of the permanency plans that were created in the case. In the course of doing so, she indicated that the parents' respective residences were now "environmentally" appropriate. She also offered testimony, however, expressing her belief that the children would be better off in their current foster care placement.

The last witness to testify was the children's foster mother, Diane T. ("Foster Mother"). Foster Mother testified that she had been a foster parent for the children since October 2016 and that she felt like she had a bond with the children. She expressed her intention to adopt the children should they be made available for adoption.

Foster Mother agreed the children loved Mother and appeared to have a bond with her, and regarding Father, Foster Mother testified that there was "absolutely" a bond between him and his children and that he was always "very attentive to his children" during visitations. She also stated that the children "feel that they have two moms and two dads."

Following the conclusion of the termination hearing, on June 1, 2018, the juvenile court entered an order that terminated both Mother's and Father's parental rights. Although the court dismissed the ground of abandonment for failure to provide a suitable home and also the ground of wanton disregard that was directed against Father, it found that the remaining grounds for termination had been established and that termination of the parents' parental rights was in the children's best interest. This appeal followed.

*In re Mickeal Z.*, No. E2018-01069-COA-R3-PT, 2019 WL 337038, at *1-7 (Tenn. Ct. App. Jan. 25, 2019) (footnotes in original but renumbered).

In the previous appeal, this Court reversed the Juvenile's Court's finding of the ground of substantial noncompliance with the permanency plan as to Father and remanded to the Juvenile Court for entry of further findings of fact in compliance with

Tennessee Code Annotated § 36-1-113(k) as to the remaining grounds against Father of persistent conditions and failure to manifest a willingness and ability to assume custody of the Children, as well as the best interest analysis. The termination of Mother's parental rights was affirmed during the previous appeal.

On remand, the Juvenile Court entered an order with additional findings of fact as instructed by this Court. Father timely appealed to this Court.

## Discussion

Although not stated exactly as such, Father raises three issues for our review: (1) whether the Juvenile Court erred in finding that DCS had proven by clear and convincing evidence the statutory ground of persistent conditions, (2) whether the Juvenile Court erred in finding that DCS had proven by clear and convincing evidence the statutory ground of failure to manifest an ability and willingness to assume custody of the Children, and (3) whether the Juvenile Court erred by finding by clear and convincing evidence that termination of Father's parental rights was in the best interest of the Children.

With regard to the termination of parental rights, our Supreme Court has instructed:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[3] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S. Ct. 1388, 71 L. Ed.2d 599 (1982); *In*

---

[3] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

*re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S. Ct. 1388. ["]Few consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 787, 102 S. Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S. Ct. 555, 136 L. Ed.2d 473 (1996). The parental rights at stake are ["]far more precious than any property right." *Santosky*, 455 U.S. at 758-59 102 S. Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759, 102 S. Ct. 1388 (recognizing that a decision terminating parental rights is ["]*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to ["]fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S. Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S. Ct. 2153, 68 L. Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated ["]fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S. Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). ["]Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1113[sic](c) provides:

> Termination of parental or guardianship rights must be based
> upon:

(1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[4] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[5] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1113[sic](k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id.* This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental]

---

[4] Tenn. Code Ann. § 36-1-113(g)(1)-(13).
[5] Tenn. Code Ann. § 36-1-113(i).

- 15 -

rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n.15 (Tenn. Ct. App. 2007)).

### B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered).

We first address Father's issue of whether the Juvenile Court erred in finding by clear and convincing evidence that the conditions leading to the Children's removal from the parents persisted. Although the statute at issue has since been amended, the version of Tennessee Code Annotated § 36-1-113(g)(3) (2017) that was in effect at the time of the termination petition's filing and is applicable to the current proceeding stated as follows:

The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;
>
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and
>
> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

On appeal, Father contends that this ground is not applicable because the Children were not removed from his home. In order to establish the statutory ground of persistent conditions, the child must have been removed from the home of the parent whose rights are the subject of the termination proceeding. *See* Tenn. Code Ann. § 36-1-113(g)(3) (2017); *In re Mickia J.*, No. E2016-00046-COA-R3-PT, 2016 WL 5210794, at *5 (Tenn. Ct. App. Sept. 19, 2016) ("[A]s a threshold requirement for applicability of the ground of persistence of conditions in termination of parental rights cases, the child must not only have been adjudicated dependent and neglected, but he or she must also have been removed from the defendant parent's home.").

Father argues on appeal that the Children were residing with the maternal grandfather and not with the parents at the time of removal. The record does not support this contention. The evidence reflects that the parents were living together in Middlesboro, Kentucky at the time of the removal. Both the initial removal petition and order identified the parents as residing at a Brentwood Circle address in Middlesboro, Kentucky. During trial, Father testified that he was living at the Brentwood Circle address at the time of the removal and that they had recently moved from a home in Clairfield. Mother also testified that she was living at the Brentwood Circle home in October 2016 when the Children were removed.

During trial, both Mother and Father testified that the Children had been staying with the maternal grandfather. According to Father, this arrangement resulted from DCS instructing Mother to place the Children with the maternal grandfather "until [they] got better living conditions." Although the parents testified during trial that the Children had been placed with the maternal grandfather by agreement, the facts in the removal petition,

which both Mother and Father had stipulated as true, indicate that Mother informed DCS that the Children had been staying with the maternal grandfather at night but had been with Mother since the weekend. The Children were removed and placed in DCS custody on October 12, 2016, which was a Wednesday. Mother and Father were residing together at the time, and the Children had been living with them exclusively for at least several days. We find and hold that the Children were removed from the home of the parents for purposes of Tennessee Code Annotated § 36-1-113(g)(3). Therefore, we find Father's argument on this issue to be without merit.

We next address whether the evidence supports the Juvenile Court's finding regarding the ground of persistent conditions. The Juvenile Court found that the parents' inability to have "appropriate conflict resolution" was the condition that led to the Children's removal from the parents. As the Juvenile Court found, the Children's removal from the parents "was predicated upon the domestic violence in the home, drug use of the mother, lack of a suitable home and lack of proper/safe transportation." At the time of the removal, Mother had informed DCS that she and Father were no longer together because he had kicked her in the face when she tried to wake him up. During trial, Father testified that he remembered Mother telling him that he had kicked her in the face and stated that they broke up after the incident. Father testified that Mother left in his truck and said "'Bye Sucker. I won't be back because you ain't going to kick me like that.'" Mother and the Children were found later that day in a broken-down vehicle on the side of the road, having been stranded for six hours. Shortly after the removal, the Children were found by the Juvenile Court to be dependent and neglected based on the facts stipulated to by the parents in the removal petition.

The parents' relationship consisted of frequent fighting, much of which was centered around Mother's drug use. The Juvenile Court found that domestic violence issues with the parents existed as recently as March 2018 relating to a gun. The Juvenile Court pointed to Mother's testimony that she had woken up with a gun laying beside her and that they began arguing with Father accusing her of stealing a gun. The Juvenile Court further emphasized an incident where Mother told Ms. Raines that Father had thrown Mother out of the car and tried to break her finger. Ms. Raines had testified to the volatility of the parents' relationship and the bickering and shouting she observed. Additionally, Father described an argument between him and Mother. According to Father, Mother accused him of being on the internet with people. Father testified that he decided he did not need the phone and trashed the phone to get rid of it.

Ms. Raines visited the parents' home in April 2017. Father was not present at the time because the parents had a fight, and he had left for a few days. During that visit, Ms. Raines observed profanity written on the wall and holes in the wall. Father testified that after they had an argument and he left the home, Mother would write on the wall or knock a hole in the wall. Despite the condition of that home, the home where Father was

living at the time of trial was an appropriate physical home. However, DCS raised concerns with Mother's close proximity to Father's home. Both Mother and Father testified that Mother owned the home where Father was residing. Furthermore, Mother had made statements to DCS that she had placed a baby monitor in the trailer where Father and the Children were residing and that she would "run over and help him" if she heard any issues.

Despite Father's continued contact with Mother and the frequent arguments and incidents between the two, Father did not attend family counseling as recommended by DCS. He reasoned that "it seemed like everybody wanted us to split up and not be a family." According to Father, Mother could not be around the Children if she were not clean. Father questioned, "if she's not there, why do we need counseling with each other?" The Juvenile Court found that Father's refusal to attend family counseling was a "major concern" for the Court.

Father had maintained a relationship with Mother, whether romantic or not. Father testified that he had driven Mother to court on the day of trial. As found by the Juvenile Court, the parents resided in trailers beside one another at the time of trial. Mother continued using drugs throughout the case, and Father was aware of Mother's failed drug screens and her recent methamphetamine-related criminal charges. Despite the parties' arguments about Mother's drug use, Mother called Father to pick her up from rehab when she left just twelve hours after entering the program.

We further note that Father had incurred criminal charges while the Children were in DCS custody. Although the Juvenile Court did not specifically identify Father's criminal charges, the record shows Father's criminal history. Father had been arrested for criminal trespassing and shoplifting. Father was arrested for first degree criminal trespassing in April 2017, and Father testified that the charge resulted in a fine. The record further reflects that Father was charged with shoplifting in August 2017 and was later convicted. Two bench warrants were issued out of Kentucky for Father's arrest due to a failure to appear and failure to pay fines. Father only resolved those issues the week before trial. Although not particularly serious offenses, Father's criminal activity, combined with his volatile relationship with Mother, is indicative that the conditions which led to the Children's removal persist and would, in all likelihood as found by the Juvenile Court, lead to further abuse or neglect to the Children if they were returned to his custody.

Father's continued relationship with Mother was a concern for the Juvenile Court due to Mother's drug use and the parents' continued inability to communicate, which had resulted in continuing turmoil and domestic violence in the family setting. The Juvenile Court emphasized that at the time of trial, the parents were still living in side-by-side trailers and "continuing to have domestic issues and civility issues that simply could not

be remedied to provide a safe return of the children." According to the Juvenile Court, Father's failure to recognize that turmoil and domestic violence and his refusal to attend family counseling would in all likelihood prevent the conditions from being remedied, lead to further neglect for the Children, and would prevent a safe return to the care of Father. Additionally, continuation of the parent-child relationship between Father and the Children would diminish the Children's chances of early integration into a safe and stable home. The evidence does not preponderate against any of the Juvenile Court's findings. We find and hold, as did the Juvenile Court, that DCS has proven the ground of persistent conditions by clear and convincing evidence.

We next address whether the Juvenile Court erred in its finding that DCS had proven by clear and convincing evidence the statutory ground of failure to manifest an ability and willingness to assume custody of the Children. Tennessee Code Annotated § 36-1-113(g)(14) (2017) provides:

> A legal parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

As to this ground, the Juvenile Court focused on the fact that Mother and Father continued to live in two trailers side by side each other as recent as May 2018, the day of trial. The Juvenile Court found that "[t]he act of having the two (2) trailers side by side clearly provided proof that the parents intended to always be together if the children were returned." Mother's and Father's relationship clearly is tumultuous. The Juvenile Court found that domestic issues had continued between Mother and Father and that the parents were evicted from a mobile home due to their continuous fighting and Mother's drug use. The Juvenile Court also emphasized other incidents of fighting and arguing between the parties, including the argument regarding a gun and the statements Mother made to Ms. Raines about Father kicking her out of the vehicle and attempting to break her finger. Mother had broken into the trailer where Father was residing after he had locked her out and had "used the hammer to destroy the drywall" and written "vulgar graffiti on the walls." Mother's drug use also hampered the relationship. Father clearly had made a decision to maintain some kind of relationship with Mother despite her drug use and the volatility of their relationship.

Additionally, Father's ongoing criminal activity while the case was pending is concerning. Although the offenses were not particularly serious, Father only resolved those issues one week before trial. The Juvenile Court did acknowledge that Father had completed parenting and anger management classes as requested. However, the Juvenile Court found that Father's refusal to comply with family counseling was a "major

- 20 -

concern." As such, the Juvenile Court found that "it is clear and convincing that [Father's] refusal to engage in the task of family counseling and learn how to act appropriately and civilly around his family indicated an unwillingness to assume legal and physical custody of the children." Based on the same evidence, the Juvenile Court found that Father had not demonstrated "an ability to conduct himself in an appropriate way" such that he is able to care for the Children. Additionally, the Juvenile Court found that the situation which caused the Children to be placed in DCS custody resulted in large part from Father's action of kicking Mother in the face. The Juvenile Court found that due to Father's behaviors and his failure to conduct himself appropriately, returning the Children to his custody would pose a risk of substantial harm to the Children's physical or psychological welfare. The evidence does not preponderate against any of these findings by the Juvenile Court. We find and hold, as did the Juvenile Court, that DCS has proven this statutory ground by clear and convincing evidence.

Having determined that grounds exist for the termination of Father's parental rights, we next address the best interest analysis. Tennessee Code Annotated § 36-1-113(i) provides a set of non-exclusive factors courts are to consider in determining whether termination of parental rights is in a child's best interest:

> (i) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following
>
> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
>
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6)     Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7)     Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)     Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9)     Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (Supp. 2019).

With regard to making a determination concerning a child's best interest, our Supreme Court has instructed:

When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. *In re Carrington H.*, 483 S.W.3d at 523 (citing *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555 (citing *In re Audrey S.*, 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id.* When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme"

evident in all of the statutory factors. *Id*. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. *See In re Audrey S.*, 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. *In re Carrington H.*, 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

On appeal, Father contends that the Juvenile Court erred by finding clear and convincing evidence that termination of his parental rights was in the Children's best interest. The Juvenile Court considered the factors enumerated in Tennessee Code Annotated § 36-1-113(i) before ultimately concluding that those relevant factors weighed in favor of terminating Father's parental rights to the Children.

As relevant to factor (1), the Juvenile Court found that although Father's home was environmentally safe, Mother lived next door to Father. According to the Juvenile Court, the parents "cannot conduct themselves in a civil manner such as to make the conditions safe for the children." The Juvenile Court found that "the proof is clear and convincing that when [Mother] and [Father] are together, then there is a substantial risk of domestic violence, fighting, arguing, kicking, drug use, destruction and vandalism, threats of self-harm to themselves and threats of harm to others." Despite the volatile relationship and Mother's drug use, Father maintains a relationship with Mother. The

Juvenile Court found that Father had nineteen months to make appropriate adjustments to his conduct but that he had not improved his situation such that it was safe for the Children to return home to him.

In its analysis regarding factor (2), the Juvenile Court addressed Father's failure to address the conflict resolution issue between the parents and found that the requirement for Father to complete family counseling was very important in this case. Despite its importance, Father had not completed family counseling. According to the Juvenile Court, services were made available to the parents but Father had failed to effect a lasting change to his conduct.

Pursuant to factors (3) and (4), Father had maintained regular visitation with the Children, and they had a meaningful relationship with him. The Juvenile Court recognized that Father had acted appropriately during visits with the Children and that Father and the Children have a bond and love for one another. However, as to factor (5), the Juvenile Court found that the foster home was peaceful and that Father's home would not be peaceful but instead full of turmoil, fighting, and bickering. The Juvenile Court, therefore, found that changing the Children's caretakers from the foster home to Father would have a negative effect on the emotional, psychological, and medical conditions of the Children.

The Juvenile Court found that factor (6) did not apply to the present case. As to factor (7), the Juvenile Court found that Father had only resolved his criminal issues one week before trial, and prior to that, there was a warrant for his arrest in Bell County, Kentucky. Furthermore, the Juvenile Court found that Father's physical home was not safe or healthy for the Children with Mother residing next door. We note that Mother had consistently used illegal substances throughout the time the Children were in DCS custody and that Father continued to maintain some form of relationship with her. The Juvenile Court found that Father was unable to consistently care for the Children in a safe and stable manner.

Pursuant to factor (8), the Juvenile Court recognized that Father had completed anger management classes and parenting classes. However, the Juvenile Court found that Father had not attended family counseling in order to "learn how to resolve conflict in appropriate ways so as to not place the children in unsafe and unstable situations." The Juvenile Court noted that the parties had not presented evidence regarding factor (9).

Based on the statutory factors in Tennessee Code Annotated § 36-1-113(i), the Juvenile Court concluded that DCS had proven by clear and convincing evidence that termination of Father's parental rights was in the Children's best interest. Upon our review of the record on appeal, we determine that the evidence presented does not preponderate against the Juvenile Court's findings and that those findings are clear and

convincing evidence that termination of Father's parental rights was in the best interest of the Children. We, therefore, affirm the Juvenile Court's judgment terminating Father's parental rights to the Children.

## Conclusion

The judgment of the Juvenile Court terminating Father's parental rights to the Children is affirmed, and this cause is remanded to the Juvenile Court for collection of the costs assessed below. The costs on appeal are assessed against the appellant, Ed P., and his surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE